01

02

03

04

05                     UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF CALIFORNIA

06   ERIN DECESARE,                          )
                                             )
07          Petitioner,                      )    CASE NO. 2:07-cv-01016-RSM-JLW
                                             )
08          v.                               )
                                             )
09   TINA HORNBEAK, Warden, *et al.*,        )    REPORT AND RECOMMENDATION
                                             )
10          Respondents.                     )
     _____ )

11

12          I.      INTRODUCTION

13          Petitioner is currently incarcerated at the Valley State Prison for Women, in

14   Chowchilla, California.  With the assistance of counsel, she seeks relief under 28 U.S.C.

15   § 2254 from her 2005 jury conviction in the Placer County Superior Court for one count of

16   theft from an elder by a non-caretaker, one count of grand theft of personal property, and two

17   counts of disobeying a court order.  (*See* Docket 1 at 2.)  These charges all relate to

18   petitioner's theft of money from a 95-year-old-man with dementia who petitioner had recently

19   married.  Petitioner is currently serving a determinate sentence of three years in prison.[1]  (*See*

20   Dkt. 2 at 2.)  Respondent has filed an answer to the petition, along with relevant portions of

21   _____

22          [1] The Court notes that, as the instant habeas petition was filed on May 29, 2007, petitioner's three-year
     sentence may have already expired.  As of the date of this Report and Recommendation, however, this Court has
     not received any information from either party indicating that petitioner has been released from confinement.
     Furthermore, given the substantial period of time this case has been pending in this Court, through no fault of the
     parties, the undersigned has chosen to proceed to the merits.

REPORT AND RECOMMENDATION - 1

01  the state court record, and petitioner has filed a traverse in reply to the answer.  (*See* Dkts. 15

02  and 16.)  The briefing is now complete and this matter is ripe for review.  The Court, having

03  thoroughly reviewed the record and briefing of the parties, recommends that the Court deny

04  the petition and dismiss this action with prejudice.

05      II.    FACTUAL AND PROCEDURAL HISTORY

06          On direct review, the California Court of Appeal summarized the relevant facts

07  adduced during petitioner's trial as follows:

08      A.    *Current Offenses*

09          In 2002, at age 93, Edward Jackson divorced his wife
          after 38 years of marriage.  He was diagnosed with dementia
10          and his only son, David, began caring for him.[2]   David had
          been given power of attorney by Edward over his affairs and
11          handled all of Edward's bills.  He never saw his father go to an
          automated teller machine (ATM) or withdraw money from the
12          bank.  David was also trustee of Edward's assets, which
          included a home in Arden Park, an almond ranch, and stocks.
13          Edward also had checking accounts at the Schools Financial
          Credit Union and at Wells Fargo, both which were under
14          Edward's and David's names.
              David worked full time but would visit Edward every
15          night. David believed Edward's dementia was getting worse:
          Edward would get lost going around the block on his scooter,[3]
16          believed he invented chrome, thought he was going to win the
          Nobel Peace Prize, and believed he was going to marry the
17          Queen of England. Edward was lonely and had asked every
          woman in the neighborhood to move in with him.
18              In April 2003, David hired 20-year-old Mandy Brazell
          to clean Edward's house every other week.  Brazell and Edward
19          became friends, and she visited him during the day and
          occasionally took him to dinner at his favorite restaurant.
20              Around   Christmastime   2003,   Brazell   answered
          defendant's newspaper advertisement for a car for sale.  Brazell

21

22      [2] To avoid confusion and not out of any disrespect, we will refer to members of the Jackson family by
their first names.
      [3] Edward could not drive a car because his license had been revoked following a medical evaluation.

01       saw the car, and she and defendant struck up a conversation.  A
         couple of days later, Brazell called defendant to tell her she was
02       not going to purchase the car, and the two started talking again.
         They began conversing regularly, and Brazell eventually told
03       defendant about "the guy [who she] was working for."  Brazell
         said she felt sorry for him and mentioned that he owned a house
04       and a ranch.  Defendant, who was 47 years old, said she also
         had taken care of older people.

05               In mid-January 2004, Brazell set up a meeting between
         defendant and Edward because Edward wanted to get out of the
06       house and meet other people. Brazell did not tell David about
         the meeting because Edward did not want her to.  Brazell drove
07       Edward to a restaurant to meet defendant and stayed through the
         meal. Thereafter, Brazell saw Edward and defendant together
08       once at his house.

09               In February 2004, David's 31-year-old son, Brandon,
         moved in with Edward at David's request to help Edward with
10       his daily needs. Brandon never saw Edward handle his own
         money.

11               In April 2004, David took Edward to Kaiser Hospital to
         see his primary care physician, Kristen Robinson. David was
12       concerned about Edward's dementia and wanted to talk about a
         possible conservatorship. Dr. Robinson noticed Edward's
13       delusions had worsened, he seemed depressed, and she thought
         he might have had a stroke. Concerned that Edward's
14       psychiatric condition was severely impairing his ability to make
         appropriate decisions, Dr. Robinson wrote a letter supporting
15       conservatorship. In Dr. Robinson's opinion, anyone in regular
         daily or weekly contact with Edward would have been aware of
         his "fairly significant mental problems and cognitive defects."

16               On May 14, 2004, at a conservatorship court hearing,
         David was surprised to learn that Edward was being represented
17       by an attorney. Two days before the hearing, at Edward's
         request, Brazell had contacted probate attorney Carlena Tapella
18       whose name Brazell had found in the telephone book. Edward
         told Tapella he was very unhappy, and David was being
19       secretive about finances and wanted to sell his house and put
         him in a "home."

20               The night of the conservatorship hearing, David went to
         Edward's house and told him he had met Edward's attorney.
21       Edward said he did not know anything about an attorney.

22               On May 18, 2004, David telephoned Edward throughout
         the day but received no response. He tried to use the ATM card
         for their Wells Fargo account, but it did not work. He called

REPORT AND RECOMMENDATION - 3

01  Wells Fargo and found out that Edward had somehow gotten to Roseville and closed the account there.[4]  David filed a missing
02  person's report with the Sacramento Police Department.

03  Unbeknownst to David or Brandon, defendant and Edward picked up Brazell on May 18 and drove to Reno where Edward and defendant married.

04  On the morning of May 19, Brazell called Brandon and told him Edward was "all right" and was with a "caregiver" but
05  refused to provide the caregiver's name. David called his attorney, Alan Schostag, who in turn called Tapella. Tapella
06  contacted Brazell and defendant and then called Schostag. Schostag told David about the marriage. David "almost fell off
07  [his] chair." "It was like [his] worst nightmare come true."

08  At approximately 5:00 p.m. the same day, defendant went to Wells Fargo in Roseville, upset and screaming that the bank was not honoring checks drawn on "her" account. The
09  teller asked to speak with the owner of the account, and defendant said he was in the car.  When defendant went to get
10  Edward, the teller called 911 and reported a "disoriented 95-year-old male" and female "trying to get money out of a
11  checking account."

12  Roseville Police Officer David Flood was dispatched to the bank and spoke with defendant and Edward.  Defendant said she had met Edward six months ago, they married yesterday,
13  she was his caregiver, and she was trying to get money out of "their checking account." When Officer Flood questioned
14  Edward, defendant would interrupt and either try to finish his answers or would provide an answer that defendant would agree
15  with or repeat.

16  When Officer Jason Bosworth arrived at the bank, defendant and Edward were separated.  Defendant said she had befriended Edward to help him out because David was after his
17  money. She said they were "planning on getting married eventually." As Officer Bosworth continued to question her,
18  defendant said she and Edward had married six months ago, and then said they "were married just recently."

19

20  ─────────────────
    [4] According to the records from Wells Fargo, on May 18, 2004, two accounts in the names of Edward
21  and David were closed and on the same day two new accounts in Edward's name only were opened and $681.98 in cash from Edward's and David's accounts was not redeposited in the new accounts.
    According to the records from Schools Financial Credit Union, on May 18, 2004, two accounts in the
22  names of Edward and David were closed and on the same day two new accounts in Edward's name only were opened and $830 in cash from Edward's and David's accounts was not redeposited in the new accounts.
    All of these transactions took place in Placer County.

01        When Officer Flood questioned Edward separately, Edward referred to defendant only as "a nice lady [who] takes care of me." When asked how long he had been married, Edward replied six months, but later said it was "two or three months or so." Believing Edward suffered from dementia, Officer Flood took him to the hospital.

        At 7:30 p.m., the hospital called David and told him Edward was in the emergency ward. David thought Edward seemed very disoriented, and he did not know where he had been. Edward's wallet had no money and was missing his Social Security card and identification.

        David retained attorney Larry Sinclair to have Edward's marriage annulled, after "Legal Services" would not "help [him] out." David also had a restraining order filed against defendant prohibiting her from contacting Edward.

        David met defendant for the first time shortly after May 18 when she came to David's property looking for Edward. David got very angry and told her [to] leave. Defendant complied. David saw defendant again at all of the conservatorship proceedings, which she was "fighting."

        At the end of May 2004, Edward moved into the Sunrise Retirement Villa. In June, defendant called the retirement home and asked if Edward was there. She called an additional three times to obtain information about Edward's residency at the retirement home and three times to speak with him. Another time, defendant and Brazell went to the retirement home and dropped off a court document to set aside the annulment and a note saying, "[P]lease call me. I love you. Your wife, Erin. Hope you're okay. Miss you and want you to come home."

        In July, police spoke to defendant about violating the restraining order. Defendant said she had called the retirement home several times and Brazell had taken her there. She also admitted she and Edward had closed the two bank accounts that had David's name on them and removed his name from the accounts. They withdrew approximately $1,500 from the accounts and used $300 for the wedding, $400 for a psychological examination of Edward, and an unstated amount for clothes at K-Mart and a dinner. When asked to account for the remaining money, defendant had no response. She also had no explanation for why Edward had no money when he was escorted out of Wells Fargo.

        After May 2004, Edward's condition substantially deteriorated. He cannot walk, has no short-term memory, and does not recognize David or his grandchildren.

REPORT AND RECOMMENDATION - 5

B.   *Prior Acts Of Elder Financial Abuse*

In 1989, Carolyn Young became the court-appointed conservator for octogenarian Adam DeCesare. DeCesare's main asset was his stock portfolio. Young arranged to pay for DeCesare's lodging and meals in a care facility and provided him $500 per month in spending money.

DeCesare met defendant while living in the care facility after his wife died.  In fall 1989, DeCesare called Young asking for more money from his estate, and defendant was heard in the background telling him what to ask for. Defendant's requests included $10,000 so DeCesare could take her and her daughter to Disneyland and a $1,000 increase in his monthly spending allowance.  DeCesare also set up a college fund for defendant's daughter and included both defendant and her daughter in his will.

Believing all defendant wanted from DeCesare was money, Young successfully sought a court order prohibiting defendant from visiting DeCesare without Young's approval and prohibiting defendant from removing DeCesare from the care facility.  In November 1990, defendant took DeCesare to Reno, where they married. Thereafter, DeCesare paid for a $4,500 honeymoon cruise to the Caribbean.

After they married, defendant and DeCesare lived together in a home purchased by defendant and paid for by DeCesare.

Young successfully petitioned to have the marriage annulled, and defendant unsuccessfully petitioned to have Young removed as conservator.  Young also filed a restraining order against defendant on behalf of DeCesare.  DeCesare died in 1994.

Prior to her marriage to DeCesare, defendant was married to Garrett Leiman, who was three years her senior. Leiman knew DeCesare as "a nice old little guy" whom they would visit in the care facility. When defendant realized her marriage to Leiman was over, she repeatedly told Leiman she was going to marry DeCesare and take care of him.

(Dkt. 17, Lodged Document 5, at 2-9.)

The California Court of Appeal affirmed the Placer County Superior Court's judgment on December 12, 2006, and the California Supreme Court denied review on March 28, 2007.

REPORT AND RECOMMENDATION - 6

01 (*See id*. at 34; Dkt. 17, LD 6.)  Petitioner did not seek habeas relief from the state courts.  (*See*

02 Dkt. 1 at 2.)  Petitioner timely filed the instant federal habeas petition on May 29, 2007.  (*See*

03 Dkts. 1 and 2).

04        III.      FEDERAL CLAIMS FOR RELIEF

05        In her federal habeas petition, petitioner argues that the evidence admitted against her

06 at trial violated her federal due process rights.  (*See* Dkt. 1.)  Specifically, she alleges:

07        (1)      California Evidence Code § 1109 is unconstitutionally vague as applied to
                    petitioner; and

08
        (2)      The admission of propensity evidence at petitioner's trial violated her federal
09                    due process rights.

10 (*See* Dkt. 2 at 4 and 7.)

11        Respondent concedes that petitioner has exhausted all her claims for relief, but

12 contends that her claims are without merit.  (*See* Dkt. 15 at 2.)

13        IV.      STANDARD OF REVIEW

14        The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

15 petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

16 320, 326-27 (1997).  Because petitioner is in custody of the California Department of

17 Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

18 vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004)

19 (providing that § 2254 is "the exclusive vehicle for a habeas petition by a state prisoner in

20 custody pursuant to a state court judgment. . . .").  Under AEDPA, a habeas petition may not

21 be granted with respect to any claim adjudicated on the merits in state court unless petitioner

22 demonstrates that the highest state court decision rejecting his petition was either "contrary to,

REPORT AND RECOMMENDATION - 7

01  or involved an unreasonable application of, clearly established Federal law" as determined by

02  the U.S. Supreme Court, or "was based on an unreasonable determination of the facts in light

03  of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1) and (2).

04      As a threshold matter, this Court must ascertain whether relevant federal law was

05  "clearly established" at the time of the state court's decision.  To make this determination, the

06  Court may only consider the holdings, as opposed to dicta, of the U.S. Supreme Court.  *See*

07  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit precedent

08  remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

09   331 F.3d 1062, 1069 (9th Cir. 2003).

10      The Court must then determine whether the state court's decision was "contrary to, or

11  involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

12  *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

13  grant the writ if the state court arrives at a conclusion opposite to that reached by [the

14  Supreme] Court on a question of law or if the state court decides a case differently than [the]

15  Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

16  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

17  state court identifies the correct governing legal principle from [the] Court's decisions but

18  unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

19  times, a federal habeas court must keep in mind that it "may not issue the writ simply because

20  [it] concludes in its independent judgment that the relevant state-court decision applied clearly

21  established federal law erroneously or incorrectly.  Rather that application must also be

22  [objectively] unreasonable."  *Id.* at 411.

REPORT AND RECOMMENDATION - 8

01    In each case, the petitioner has the burden of establishing that the state court decision

02 was contrary to, or involved an unreasonable application of, clearly established federal law.

03 *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To determine

04 whether the petitioner has met this burden, a federal habeas court looks to the last reasoned

05 state court decision because subsequent unexplained orders upholding that judgment are

06 presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

07 (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

08    Finally, AEDPA requires federal courts to give considerable deference to state court

09 decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

10 Federal courts are also bound by a state's interpretation of its own laws.  *See Murtishaw v.*

11 *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

12 (9th Cir. 1993)).

13    V.    DISCUSSION

14       A.    *Petitioner's Claim that California Evidence Code § 1109 is Unconstitutionally*
             *Vague As Applied to Petitioner*

15

16    Petitioner contends that California Evidence Code § 1109 is unconstitutionally vague

17 as applied to her case, because the statute failed to define "financial abuse," and otherwise

18 failed to put her "on notice" that "befriending and marrying Mr. Decesare" was proscribed

19 conduct which "could be used against her in the future to establish that she had a 'propensity'

20 to abuse elders."  (Dkt. 2 at 7.)  She also argues that the California Court of Appeal's decision

21 rejecting her vagueness claim "incorrectly addressed Petitioner's vagueness claim as a facial

22 challenge to Evidence Code § 1109 rather than as a challenge for vagueness of the statute as

applied to her."  (Dkt. 16 at 2; *see* Dkt. 2 at 5-6.)

01          The U.S. Supreme Court has held that a statute is unconstitutionally vague if it fails to

02   "define the criminal offense with sufficient definiteness that ordinary people can understand

03   what conduct is prohibited and in a manner that does not encourage arbitrary and

04   discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citations

05   omitted); *see also United States v. Harriss*, 347 U.S. 612, 617 (1954).  In any vagueness

06   challenge, "[t]he threshold question . . . is whether to scrutinize the statute for intolerable

07   vagueness on its face or whether to do so only as the statute is applied in the particular case,"

08   because these are distinct inquiries.  *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1346 (9th Cir.

09   1984).

10          The U.S. Supreme Court has asserted that "it is well established that vagueness

11   challenges to statutes which do not involve First Amendment freedoms must be examined in

12   light of the facts of the case at hand."  *United States v. Mazurie*, 419 U.S. 544, 550 (1975).

13   *See Chapman v. United States*, 500 U.S. 453, 467 (1991); *United States v. Powell*, 423 U.S.

14   87, 92 (1975).  In other words, "the statute is judged on an as-applied basis."  *Maynard v.*

15   *Cartwright*, 486 U.S. 356, 361 (1988).  This is because "a plaintiff who engages in some

16   conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to

17   the conduct of others.  A court should therefore examine the complainant's conduct before

18   analyzing other hypothetical applications of the law."  *Village of Hoffman Estates v. Flipside,*

19   *Hoffman Estates, Inc*., 455 U.S. 489, 495 (1982).  In contrast, in order for a statute to be found

20   unconstitutionally vague on its face, a court would have to find that the statute is

21   "impermissibly vague in all of its applications."  *Id*.

22

REPORT AND RECOMMENDATION - 10

01          California Evidence Code § 1109 provides that "in a criminal action in which the

02   defendant is accused of an offense involving abuse of an elder or dependent person, evidence

03   of the defendant's commission of other abuse of an elder or dependent person is [admissible]

04   . . . if the evidence is not inadmissible pursuant to Section 352." Cal. Evid. Code

05   § 1109(a)(2).  California Evidence Code § 352 sets forth a general balancing test, permitting

06   the trial court in its discretion to exclude otherwise admissible evidence "if its probative value

07   is substantially outweighed by the probability that its admission will (a) necessitate undue

08   consumption of time or (b) create substantial danger of undue prejudice, of confusing the

09   issues, or of misleading the jury." Cal. Evid. Code § 352.  The definition of "abuse of an

10   elder or dependent person" includes "financial abuse." Cal. Evid. Code § 1109(d)(1).

11          Petitioner first presented her argument that California Evidence Code § 1109 is

12   unconstitutionally vague "as applied" to her case on direct appeal to the California Court of

13   Appeal.  In rejecting petitioner's contention, the court reasoned as follows:

14               *Evidence Code Section 1109 Does Not Violate Due Process*

15               Defendant contends the admission of her prior acts of
     elder financial abuse pursuant to Evidence Code section 1109
16   violated her right to due process. Specifically, she claims . . .
     Evidence Code section 1109 is unconstitutionally vague
17   because the terms "financial abuse" and "wrongful use" are not
     statutorily defined and are inherently vague . . . We are not
18   persuaded.

19          A.    *Vagueness*

20               "[I]n a criminal action in which the defendant is accused
     of an offense involving abuse of an elder or dependent person,"
21   Evidence Code section 1109 permits "evidence of the
     defendant's commission of other abuse of an elder or dependent
22   person." (Evid. Code, § 1109, subd. (a)(2).) "[A]buse of an
     elder or dependent person" includes "financial abuse." (Evid.

REPORT AND RECOMMENDATION - 11

01    Code, § 1109, subd. (d)(1).)

02    The Legislature did not define "financial abuse" in
      Evidence Code section 1109, but we presume the Legislature
      was aware that "financial abuse" is defined in Welfare and
03    Institutions Code section 15610.30 and intended that definition
      to apply to Evidence Code section 1109. (See *People v.*
04    *Harrison* (1989) 48 Cal.3d 321, 329, 256 Cal. Rptr. 401 ["the
      Legislature . . . is deemed to be aware of statutes and judicial
05    decisions already in existence, and to have enacted or amended
      a statute in light thereof," and in using identical words in
06    different sections, "the Legislature undoubtedly intended to
      convey the same meaning"].)

07    Welfare and Institutions Code section 15610.30, which
      is part of the Elder Abuse and Dependent Adult Civil Protection
08    Act (Elder Abuse Act) . . . defines "financial abuse" as either
      "(1) [t]ak[ing], secret[ing], appropriat[ing], or retain[ing] real or
09    personal property of an elder or dependent adult to a wrongful
      use or with intent to defraud, or both; or (2) [a]ssist[ing] in
10    taking, secreting, appropriating, or retaining real or personal
      property of an elder or dependent adult to a wrongful use or
11    with intent to defraud, or both." (Welf. & Inst. Code,
      § 15610.30, subd. (a).) It further defines "wrongful use" as
12    "among other things . . . secret[ing], appropriat[ing] or
      retain[ing] possession of property in bad faith." (Welf. & Inst.
13    Code, § 15610.30, subd. (b).)  It then defines "bad faith" as
      "kn[o]w[ing] or should have known that the elder or dependent
14    adult had the right to have the property transferred or made
      readily available to the elder or dependent adult or to his or her
15    representative."[5] (Welf. & Inst. Code, § 15610.30, subd.
      (b)(1).)

16    Based on the above definitions, the term "financial
      abuse" in Evidence Code section 1109 has been made
17    sufficiently clear by the Elder Abuse Act, and section 1109 is
      not void for vagueness. (See *People v. Musovich* (2006) 138
18    Cal.App.4th 983, 991, quoting *People ex rel. Gallo v. Acuna*
      (1997) 14 Cal.4th 1090, 1117 ["a 'statute will not be held void
19    for vagueness "if any reasonable and practical construction can
      be given its language or if its terms may be made reasonably
20    certain by reference to other definable sources" ' "].)

21    (Dkt. 17, LD 5 at 13-15.)

22    _____

      [5]  Here, the trial court instructed the jury on the definition of financial abuse as set forth in Welfare
      and Institutions Code section 15610.30.

01          Based upon the record before this Court, petitioner's argument that the California

02   Court of Appeal's opinion merely "examined § 1109 as a *facial* challenge to the statute's

03   general vagueness as applied to *anyone* under *any* set of facts" is unavailing.  (Dkt. 2 at 5.)

04   Viewing the state court's analysis in the context of the entire opinion, the court was clearly

05   responding to an "as applied" vagueness challenge.  (*See* Dkt 17, LD 5 at 13.)  Specifically,

06   the court was rejecting petitioner's contention that "the admission of her prior acts of elder

07   financial abuse pursuant to Evidence Code section 1109 violated her right to due process."

08   (*Id*. at 1 and 13.)  For example, the state court referenced the specific facts of petitioner's case

09   by pointing out that the jury at petitioner's trial was properly instructed on the relevant

10   definition of "financial abuse."  (*See id*. at 15 n.5.)  It also entirely limited its discussion to the

11   law that was relevant to the specific facts of petitioner's case: California Evidence Code

12   § 1109(a)(2), § 1109(d)(1), and the definitions of "financial abuse," "wrongful use," and "bad

13   faith" set forth in the Welfare and Institutions Code § 15610.30.  (*See id*. at 13-15.)

14   Furthermore, in this case the California Court of Appeal did not analyze "other hypothetical

15   applications of the law," or contemplate whether California Evidence Code § 1109 was

16   "impermissibly vague in all of its applications," as would have been necessary to establish

17   "facial vagueness" under clearly established U.S. Supreme Court precedent.  *See Flipside*,

18   455 U.S. at 494-97 (providing that in analyzing a facial vagueness challenge, a court "should

19   uphold the challenge only if the enactment is impermissibly vague in all its applications.").

20          Although AEDPA requires that "state-court decisions be given the benefit of the

21   doubt," even if the state court in this case erred by failing to sufficiently analyze California

22   Evidence Code § 1109 "as applied" to the specific facts of petitioner's case, petitioner's "as

01 applied" challenge lacks merit. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  Specifically,

02 petitioner has offered nothing in these proceedings to contradict the state court's conclusion

03 that the meaning of "financial abuse" in California Evidence Code § 1109 was made

04 sufficiently clear by the definition of that term in the Welfare and Institutions Code

05 § 15610.30.  Although petitioner asserts that her prior conduct with Mr. Decesare was "not

06 'financial abuse' if judged against plain meaning," based upon the record before this Court,

07 her conduct clearly satisfied the statutory definition of "financial abuse" set forth in Welfare

08 and Institutions Code § 15610.30, which includes obtaining or retaining possession an elder's

09 personal property in bad faith.  (Dkt. 2 at 6; *see* Dkt. 17, LD 5 at 14-15.)  *See* Welf. & Inst.

10 Code § 15610.30 (amended 2009).  As a result, petitioner was on notice that her conduct with

11 Mr. Decesare constituted proscribed financial abuse.  *See Kolender*, 461 U.S. at 357

12 (providing that a statute is not void-for-vagueness where a criminal offense is defined with

13 sufficient definiteness that ordinary people can understand what conduct is prohibited).  Most

14 significantly, she was also on notice under California Evidence Code § 1109 that her conduct

15 with Mr. Decesare could be used against her in future proceedings to establish that she had a

16 propensity to abuse elders.  (*See* Dkt. 2 at 7.)

17        Accordingly, petitioner has not shown that the California Court of Appeal's rejection

18 of her vagueness claim was contrary to, or an unreasonable application of, clearly established

19 federal law, or based upon an unreasonable determination of the facts.  The state court

20 reasonably found that California Evidence Code § 1109 is not unconstitutionally vague "as

21 applied" to petitioner's case.  I therefore recommend that petitioner's vagueness claim be

22 denied.

REPORT AND RECOMMENDATION - 14

01

B.    *Petitioner's Claim that the Admission of Propensity Evidence at Her Trial Violated Her Due Process Rights*

02

03    Petitioner contends that the California Court of Appeal's decision denying her due

04 process claim made a "blanket finding" that the admission of propensity evidence under

05 California Evidence Code § 1109 "can never violate due process," which she posits was "out

06 of step with each federal circuits' application of Supreme Court precedent."  (Dkt. 2 at 7-8;

07 Dkt. 16 at 2.)  Although she acknowledges that the U.S. Supreme Court has never expressly

08 held that it may violate due process to admit propensity evidence at trial, she asserts that the

09 U.S. Supreme Court has "established a general principle that evidence that 'is so extremely

10 unfair that its admission violates fundamental conceptions of justice' may violate due

11 process."  (Dkt. 2 at 7.)  Thus, she claims that "[t]his Court can and should rely upon the

12 Supreme Court's general precedent and find upon the facts of this case that the admission of

13 propensity evidence . . . violate[d] fundamental concepts of justice."  (Dkt. 16 at 2; *see* Dkt. 2

14 at 7.)  In support of her claim, petitioner cites *Dowling v. United States*, 493 U.S. 342, 353

15 (1989), and *Alberni v. McDaniel*, 458 F.3d 860, 866 (9th Cir. 2006).  (*See id.*)

16    The U.S. Supreme Court "has never expressly held that it violates due process to

17 admit other crimes evidence for the purpose of showing conduct in conformity therewith, or

18 that it violates due process to admit other crimes evidence for other purposes without an

19 instruction limiting the jury's consideration of the evidence to such purposes."  *Garceau v.*

20 *Woodford*, 275 F.3d 769, 774 (9th Cir. 2001), *overruled on other grounds by Woodford v.*

21 *Garceau*, 538 U.S. 202 (2003).  To the contrary, the Supreme Court has expressly left open

22 the precise question of whether propensity evidence offends the Due Process Clause.  *Estelle*

*v. McGuire*, 502 U.S. 62, 75 n.5 ("Because we need not reach this issue, we express no

REPORT AND RECOMMENDATION - 15

01   opinion on whether a state law would violate the Due Process Clause if it permitted the use of

02   'prior crimes' evidence to show propensity to commit a charged crime.").

03        "[B]eyond the specific guarantees enumerated in the Bill of Rights," the federal Due

04   Process Clause has limited operation. *Dowling*, 493 U.S. at 352.  State laws only violate the

05   Due Process Clause if they offend "some principle of justice so rooted in the traditions and

06   conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37,

07   43 (1996).  Thus, review of a due process claim in a federal habeas corpus petition is limited

08   to determining whether the trial court made an error that rendered the trial so arbitrary and

09   fundamentally unfair that it violated federal due process.  *Estelle*, 502 U.S. at 67; *Walters v.*

10   *Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).  The U.S. Supreme Court has "defined the

11   category of infractions that violate 'fundamental fairness' very narrowly," as those "which lie

12   at the base of our civil and political institutions" and define "the community's sense of fair

13   play and decency." *Dowling*, 493 U.S. at 352-53.  *See also Mejia v. Garcia*, 534 F.3d 1036,

14   1047 (9th Cir. 2008) (holding that a state court had not acted objectively unreasonable in

15   determining that the introduction of propensity evidence "in the total context of this case did

16   not render the trial fundamentally unfair.").

17        The California Court of Appeal denied petitioner's due process claim on direct review.

18   Specifically, it reasoned as follows:

19              B.   *Noncriminal Conduct Used As Propensity Evidence*

20                   We turn then to defendant's argument that Evidence
     Code section 1109 violates due process because it allows vague,
21   noncriminal conduct to be used as propensity evidence.
     Evidence Code section 1109 does not mention evidence of prior
22   *convictions*. Instead, it refers to "evidence of the defendant's

01    commission of other abuse of an elder or dependent person."
(Evid. Code, § 1109. subd. (a)(2).) In *People v. Falsetta* (1999)
02    21 Cal.4th 903, our Supreme Court construed Evidence Code
section 1108, a companion statute covering evidence of other
03    sexual offenses. (*Falsetta*, at p. 916.) *Falsetta* upheld the
constitutionality of Evidence Code section 1108 despite the
04    defendant's argument that the admission of evidence of a prior
sex offense violated due process because it allowed evidence to
05    be considered for purposes of propensity. (*Falsetta*, at pp. 907,
910.) Although *Falsetta* involved the admission of other sex
06    crimes, its holding did not turn on the criminality of defendant's
prior sexual acts. (*Id*. at pp. 909-910, 917.) Rather, the *Falsetta*
07    court found that "the trial court's discretion to exclude
propensity evidence under section 352 saves section 1108 from
08    defendant's due process challenge." (*Id*. at p. 917.) The same is
true of Evidence Code section 1109: the admission of other acts
09    of elder financial abuse is conditioned on their admissibility
under Evidence Code section 352 (Evid. Code, § 1109, subd.
10    (a)(2)), saving the statute from a due process challenge (*People
v. Johnson* (2000) 77 Cal.App.4th 410, 418-419, 420).

11

(Dkt. 17, LD 5 at 15-16.)

12

13         The conclusion of the California Court of Appeal is amply supported by the record

14 before this Court.  Specifically, although the state court's decision with respect to petitioner's

15 due process claim did not explicitly discuss the applicable federal law, petitioner has failed to

16 establish that it was contrary to or an unreasonable application of clearly established U.S.

17 Supreme Court precedent, or based upon an unreasonable determination of the facts.

18         As a threshold matter, petitioner has not provided any reasons why the admission of

19 evidence of her prior conduct with Mr. Decesare at trial was "so extremely unfair . . . [it]

20 violate[d] fundamental conceptions of justice" under U.S. Supreme Court precedent.  (Dkt. 2

21 at 7; *see* Dkt. 16 at 2.)  *See Dowling*, 493 U.S. at 352-53 (where petitioner proffered "four

22 reasons why, according to him, admission of [the testimony at issue] was fundamentally

REPORT AND RECOMMENDATION - 17

01 unfair.").  As the California Court of Appeal observed, "it is logical to infer a disposition

02 toward elder theft and grand theft based on a prior act of elder financial abuse."  (Dkt. 17, LD

03 5 at 17.)  In addition, while petitioner appears to argue, on the one hand, that the admission of

04 propensity evidence in her case was so prejudicial that it rendered her trial "fundamentally

05 unfair," on the other hand she maintains that her prior conduct with Mr. Decesare was not

06 illegal, abusive, or even reprehensible.  (*See* Dkt. 2 at 6 and 8.)  If her conduct as to Mr.

07 Decesare was completely innocent, as she alleges, then it could not have been prejudicial in

08 this case.  She cannot have it both ways.  In any event, without more, petitioner's conclusory

09 allegation that based "upon the facts of this case . . . the admission of the propensity evidence

10 did violate fundamental concepts of justice" is insufficient to support her claim for habeas

11 relief.  *See Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (conclusory allegations do

12 not warrant habeas relief).

13          Petitioner has also failed to demonstrate that the California Court of Appeal's rejection

14 of her due process claim was "out of step" with the "federal circuits' application of Supreme

15 Court precedent."  (Dkt. 2 at 8; Dkt. 16 at 2.)  Petitioner relies heavily upon the Ninth

16 Circuit's comment in *Alberni*, in dicta, that

17          [i]n applying this general principle [that the admission of
          "fundamentally unfair" evidence may violate due process], both
18          our precedents and the precedents of our sister circuits have
          concluded that it could apply to the introduction of propensity
19          evidence.  Had the [state court] concluded that the introduction
          of propensity evidence could never violate due process, this
20          holding would have been out of step with each Circuit's
          application of Supreme Court precedent.

21

*Alberni*, 458 F.3d at 866.  In the instant case, however, the California Court of Appeal limited

22

its discussion to the admission of propensity evidence under California Evidence Code

REPORT AND RECOMMENDATION - 18

01 § 1109, and it did not consider whether the admission of propensity evidence under any other

02 factual scenarios or provisions of the evidence code could ever violate due process.  (*See* Dkt.

03 17, LD 5 at 15-17.)  As a result, the California Court of Appeal's conclusion was not out of

04 step with the federal circuits' decisions, as petitioner's claims.[6]  (*See* Dkt. 16 at 2.)

05   Most significantly, the *Alberni* court did not hold that this "general principle" entitles

06 a petitioner to federal habeas relief.  Rather, the *Alberni* court concluded that "when the

07 Supreme Court has expressly reserved consideration of an issue, as it has here [in *Estelle*] . . .

08 [a habeas] petitioner cannot rely on circuit authority to demonstrate that the right he or she

09 seeks to vindicate is clearly established."  *Alberni*, 458 F.3d at 864.  Thus, regardless of how

10 many circuits find that this "general principle" could potentially be extended to the admission

11 of propensity evidence, a federal habeas petitioner cannot demonstrate a right to habeas relief

12 under clearly established decisions of the U.S. Supreme Court.  *See Brewer v. Hall*, 378 F.3d

13 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal

14 law relating to the legal issue the habeas petitioner raised in state court, the state court's

15 decision cannot be contrary to or an unreasonable application of clearly established federal

16 law.").

17

18    [6]This Court observes that the California Court of Appeal's reasoning is also consistent with the
findings of other state courts that have addressed the constitutionality of California Evidence Code § 1109, or

19 similar provisions.  *See People v. Jennings*, 81 Cal.App.4th 1301, 1310 ("In short, the constitutionality of section
1109 under the due process clauses of the federal and state constitutions has now been settled.").  *See also*

20 *People v. Falsetta*, 21 Cal.4th 903, 916-17 (1999) (upholding the constitutionality of California Evidence Code §
1108, a parallel statute which addressed prior "sexual offenses" rather than prior "elder abuse," against a similar

21 due process challenge); *People v. Brown*, 77 Cal.App.4th 1334, 1331-34 (2000) (holding that California
Evidence Code § 1109 can withstand a due process challenge); *People v. Johnson*, 77 Cal.App.4th 410, 416-420

22 (2000) (same).  The Ninth Circuit has reached a similar conclusion.  *See United States v. LeMay*, 260 F.3d 1018,
1026 (9th Cir. 2001) (holding that there is nothing "fundamentally unfair" about the allowance of propensity
evidence under Federal Rule of Evidence 414, as long as the protections of Federal Rule of Evidence 403 remain
in place to ensure that prejudicial evidence of little probative value will not reach the jury).

01          Thus, as in *Alberni*, petitioner in this case has failed to demonstrate that the admission

02   of propensity evidence at trial violated her federal due process rights, because "the right

03   [petitioner] asserts has not been clearly established by the Supreme Court, as required by

04   AEDPA." *Alberni*, 458 F.3d at 867.  The state courts' rejection of petitioner's due process

05   claim was not contrary to or an unreasonably application of U.S. Supreme Court precedent, or

06   based upon an unreasonable determination of the facts.  I therefore recommend that this Court

07   find petitioner is not entitled to relief on her due process claim.

08          VI.     CERTIFICATE OF APPEALABILITY

09          The federal rules governing habeas cases brought by state prisoners were recently

10   amended to require a district court that denies a habeas petition to grant or deny a certificate

11   of appealability in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C.

12   § 2254 (effective December 1, 2009).

13          In order to obtain a certificate of appealability, a petitioner must make "a substantial

14   showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Specifically, if a

15   court denies a petition, a certificate of appealability may only be issued "if jurists of reason

16   could disagree with the district court's resolution of his constitutional claims or that jurists

17   could conclude the issues presented are adequate to deserve encouragement to proceed

18   further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  *See also Slack v. McDaniel*, 529

19   U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he

20   must demonstrate "something more than the absence of frivolity or the existence of mere

21   good faith on his . . . part." *Miller-El*, 537 U.S. at 338.  The Ninth Circuit recently described

22   this standard as "lenient." *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010).

01      For the reasons set forth in the discussion of the merits, *supra*, jurists of reason could

02  not find the result recommended in this case debatable.  Accordingly, I recommend that the

03  Court decline to issue petitioner a certificate of appealability on the issue of whether the state

04  courts' rejection of petitioner's claims were contrary to, or involved an unreasonable

05  application of, clearly established Federal law as determined by the Supreme Court of the

06  United States, or resulted in a decision that was based on an unreasonable determination of

07  the facts in light of the evidence presented.

08      VII.   CONCLUSION

09      For all of these reasons, I recommend the Court find that the state courts' decisions

10  denying petitioner's claims were not contrary to, or an unreasonable application of, clearly

11  established federal law, or based on an unreasonable determination of facts.  I further

12  recommend that the Court decline to issue a certificate of appealability and enter an Order

13  approving and adopting this Report and Recommendation, denying the petition (Dkts. 1 and

14  2), and directing that judgment be entered dismissing this action with prejudice.

15      This Report and Recommendation is submitted to the United States District Judge

16  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14)

17  days of being served with this Report and Recommendation, any party may file written

18  objections with this Court and serve a copy on all parties.  Such a document should be

19  captioned "Objections to Magistrate Judge's Report and Recommendation."  Either party may

20  then respond to the other party's objections within fourteen (14) days of being served a copy

21  of such written objections.  Failure to file objections within the specified time may waive the

22

REPORT AND RECOMMENDATION - 21

01  right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A

02  proposed order accompanies this Report and Recommendation.

03        DATED this 1st day of June, 2010.

04

05  _____

06  JOHN L. WEINBERG
United States Magistrate Judge

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION - 22